**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 50, BAKERY and CONFECTIONERY WORKERS INTERNATIONAL UNION, AFL–CIO, Respondent.**

**No. 241, Docket 24293.**

United States Court of Appeals Second Circuit.

Argued Feb. 15, 1957.

Decided May 23, 1957.

Theophil C. Kammholz, General Counsel, Stephen Leonard, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Norton J. Come, Franklin C. Milliken, Washington, D. C., for petitioner.

Howard N. Meyer, O'Dwyer & Bernstien, New York City, for respondent.

Before HINCKS, LUMBARD and WATERMAN, Circuit Judges.

LUMBARD, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order directing the respondent, Local 50, Bakery and Confectionery Workers International Union, AFL-CIO, to cease and desist from violating § 8(b) (4) (C) of the National Labor Relations Act as amended, 61 Stat. 136 (1947), 29 U.S.C.A. § 158(b) (4) (C), by picketing the premises of Arnold Bakers, Inc., of Port Chester, New York. The Board found that the picketing was intended to induce and encourage a work stoppage to force Arnold Bakers to recognize or bargain with Local 50 when another labor organization had been certified as the representative of Arnold Bakers' employees.[1] Because

1. "Sec. 8. * * *
   "(b) It shall be an unfair labor practice for a labor organization or its agent — * * *

we find no substantial evidence to support the Board's decision that Local 50's objective was to force Arnold to recognize or bargain with it and that the picketing was intended to induce a work stoppage, we deny enforcement.

Union rivalry at Arnold Bakers, Inc. has a long history. In February 1943, the New York State Labor Relations Board conducted a representation election at the plant in which Local 50 and its rival union, Arnold Bakers Employees Association, an independent, were the contestants. The Association won and in March 1943 was certified by the State Board as the representative.

In 1951 Local 50 began an intensive campaign to replace the Association as bargaining representative. On February 21 a meeting was held between Arnold and several AFL unions including Local 50 and Local 802 of the Bakery Drivers, in which Local 50 unsuccessfully urged Arnold to recognize it as bargaining agent for Arnold's employees. At a second meeting a few months later, in which the Association participated, the AFL organizations unsuccessfully tried to persuade the Association to affiliate with Local 50. The Association's representative contended that the employees did not wish to affiliate. The trial examiner found that the AFL organizations intimated picketing might ensue, but no picketing took place.

Through 1952 and 1953 Local 50 persisted in its efforts to persuade the Association to affiliate, but with no success. During the summer of 1954 Local 50 was engaged in an organizational drive in Westchester, and on August 9 at a meeting with the Association it again tried to entice the rival union into affiliating with it and again threatened to picket the plant. The Association, through its president, again refused, and thereafter, on August 12, two pickets appeared in front of Arnold's plant carrying placards which read

LOCAL 50 BAKERY AND CONFECTIONERY WORKERS
INTERNATIONAL UNION OF AMERICA
AFFILIATED WITH AMERICAN FEDERATION OF LABOR
WANTS THE EMPLOYEES OF ARNOLD'S TO JOIN THEM
TO GAIN UNION WAGES, HOURS AND WORKING CONDITIONS
HELP US TO ORGANIZE THESE EMPLOYEES
BY BUYING UNION BAKED PRODUCTS

These pickets patrolled the length of the company's property line on Travers Avenue, in Port Chester, past the main entrance to the plant and office, and past the entrances to the shipping platform and to the employees' parking lot.

The pickets were instructed not to speak to employees about union activity, and to tell any truck driver who asked that no strike or lockout was in progress and that he should cross the picket line. The trial examiner found that "the purpose of this picketing was concededly to induce Arnold employees to join Local 50."

In September, Arnold officials talked several times with Local 50 representatives, and Local 50 urged Arnold to "sign up" with them threatening dire consequences if Arnold should refuse.

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: * * * (C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 9; * * *".

Arnold did refuse claiming that it could not dictate to its employees which union they should join; none of the threatened consequences followed. The Trial Examiner found that through half of October the picketing "was peaceful, no employee or any employer refused to cross * * * [the picket line], and except for the Robinson-Smiley incident [2] there were no conversations between employees and the pickets or other Local 50 representatives relating to the picketing activity."

On October 18, 1954, the Association filed a petition with the Board requesting certification. Local 50, because it had no representation among Arnold's employees, declined to participate. In the election held on November 4, 322 out of Arnold's 356 employees voted, and 306 of the ballots were for the Association. On November 15, 1954, the Regional Director certified the Association without objection.

The picketing in front of Arnold's plant continued, however. For the first ten days after certification the pickets carried no placards but on November 26, they presented new signs, which read:

PLEASE DO NOT BUY ARNOLD'S PRODUCTS
ARNOLD EMPLOYEES HAVE REFUSED TO JOIN LOCAL 50 OF
THE BAKERY AND CONFECTIONERY WORKERS INTERNATIONAL
UNION AFFILIATED WITH AMERICAN FEDERATION OF LABOR
THE WORKING CONDITIONS AT ARNOLD'S ARE BELOW
LOCAL 50 STANDARDS IN OTHER BAKING COMPANIES
PLEASE BUY BAKERY PRODUCTS MADE BY MEMBERS OF
BAKERY & CONFECTIONERY WORKERS UNION, A.F.L.

Local 50 claims that whereas its picketing until November 15 may have been to induce Arnold's employees to join Local 50, its purpose thereafter was only to bring the dispute before the public. The Trial Examiner found that the picketing was the only means of publicity utilized by Local 50, and that since the picketing took place only in front of Arnold's plant where very few members of the public ever appeared, it was unlikely that publicity was Local 50's objective.

While the picketing was going on, the pickets frequently talked with Arnold employees about baseball and similar casual matters. However, during December 1954 and January 1955 the pickets spoke to six Arnold employees about joining the union. Typical remarks were: "When are you going to join up with us?"; "If you belonged to our union, you wouldn't have to work these hours, you would have better hours."

Toward the end of December 1954 the Regional Director sought an injunction in the District Court for the Southern District of New York under § 10(l) of the Act, 29 U.S.C.A. § 160 (l), alleging he had reasonable cause to believe Local 50 was violating § 8(b) (4) (C). Judge Dawson denied the injunction on January 5, 1955, because he did not think that the picketing was designed to induce or encourage a work stoppage. Douds v. Local 50, D.C.S. D.N.Y.1955, 127 F.Supp. 534, and we affirmed. 2 Cir., 224 F.2d 49. Thereafter the General Counsel brought this proceeding before the Board which issued a cease and desist order.

## II. The Board's Opinion

Both the Board and the Trial Examiner found that the objective was that supposed to go on strike and that Local 50 wished Arnold's employees to join it.

**2.** Smiley, a picket, contrary to his instructions, told Robinson, a truck driver making a delivery to Arnold that Arnold was

proscribed by subsection § 8(b) (4) (C) of the Act and that the picketing constituted an inducement to Arnold's employees to engage in a concerted work stoppage.

On the issue of objective, the Board did not believe Local 50's claim that its purpose was only to inform the public.[3] The Board and its Examiner found that before certification Local 50's objective "was to force or require Arnold to recognize or bargain with Local 50 presently as the representative of its employees and that in the absence of evidence to the contrary, it would be presumed that the objective continued." Our previous decision stated that Local 50's purpose was only to propagandize Arnold's employees in order to be certified in a future election. The Board did not agree that this was the Union's sole objective. Pointing out that such future certification might well be quite improbable until far in the future and that the Act proscribed not merely "the" object but "an object," the Board summed up its conclusion thusly:

"Did Local 50 harbor a forbidden objective after November 15? Its admitted objective before certification was immediate recognition. Picketing continued after certification. The professed object after certification, information to the public, was viewed with skepticism by both the District Court and the Court of Appeals for the Second Circuit in the injunction proceedings. With no evidence that Local 50 made known any change in its objective after November 15, with its asserted objective repudiated by the courts, with the opportunity for lawful recognition necessarily a remote speculation, the inference seems compelling to us that Local 50 after November 15 did not abandon hope and purpose to emerge at once as the recognized bargaining agent by reason of capitulation to its pressure. The Trial Examiner found that its desire for immediate recognition remained alive and was one of the continued objects of its picketing. We are impelled to agree with the Trial Examiner's conclusions."

The second element of illegality—the inducement to a concerted work stoppage—was disposed of by the Trial Examiner with the conclusion that under long established Board authority, picketing was by its very nature a "strike signal" and was of itself an inducement to stop work, regardless of whether such a stoppage did take place. Hence, the Examiner concluded that a finding of specific intent to induce such a work stoppage was unnecessary.

Two members of the Board seemed to take exception to this *per se* rule, stating that "conceivably, there may be other extraordinary circumstances in which a picket line cannot reasonably be found to induce employees to strike." But they concluded that this case did not present such circumstances, and specific intent need not be found. A third member agreed with the Trial Examiner on the inevitable inducement of picketing. The fourth member of the Board dissented and argued that the tendency of picketing to induce a work stoppage could be rebutted and that such rebuttal evidence existed here.

■ We hold that the Board's findings (1) that picketing was designed to induce and encourage a work stoppage, and (2) that the picketing was for the unlawful objective of forcing Arnold to bargain with Local 50 are not supported by substantial evidence in the record before us.[4]

---

3. The same contention had been put forth in the injunction action, and was received with scepticism. See 224 F.2d at page 51.

4. As noted, 245 F.2d 545, supra, this court has already passed on this controversy in an injunction proceeding on a slightly different record. However, we have not considered ourselves bound by that prior decision. That was an appeal from an injunction proceeding before a District Court under § 10(e) of the Act and not only was that record somewhat different, in that the pickets' comments to

## III. The Objective

The Board's reasoning, as noted above, relies largely on a presumption of the continuity of a state of affairs in the absence of contrary evidence. Thus, the Board reasoned, since Local 50's objective before the election was to persuade Arnold to bargain with it, this remained its objective after the election, absent a showing otherwise.

To buttress its application to this case of a presumption of continuity of purposes the Board found that "the record in this case shows that Local 50 had demanded recognition when it was at the same time refusing to participate in an election." But the last demand for recognition by Local 50 took place in September 1954, whereas the Association filed its petition for an election on October 18 and Local 50 declined to participate on October 21, 1954. We therefore are unable to find any support for the Board's conclusion, that "Local 50 did not consider the fact that it had not been and could not be designated by the employees through an election a valid argument against its immediate recognition."

As to the presumption itself, it is undisputed that before the certification election, Local 50 had a dual purpose—to induce Arnold's employees to join Local 50 and to obtain immediate recognition from Arnold. Both were then reasonably possible. But with the certification on November 15 the situation changed

radically, and this the Board ignored. Although persuading employees to join Local 50 was still possible, the certification of the Association made it virtually impossible for Local 50 to induce Arnold to deal with it exclusively for some time, particularly since Arnold had consistently refused during many years of argument and several months of picketing. In the absence of any independent supporting evidence, there is no warrant for the conclusion that Local 50's original objective of immediate recognition as exclusive bargaining agent survived the certification of the Association.[5] The fact that Local 50 sought recognition at a time when it was lawful to do so should not raise a presumption that it also sought recognition when it had become unlawful to do so.

On the other hand, all the circumstances and evidence point to an objective which is not only more feasible and immediate but also permissible, namely, organizing Arnold's employees in hope of eventual certification at some future date. The statements to the Arnold employees in December and January, noted above, indicate this.

The Board however, held that although one of Local 50's objectives was to organize the plant with the hope of eventual certification, it also continued to entertain the additional objective of gaining immediate recognition and that § 8(b) (4) (C) proscribes picketing where merely "an objective" is for a prohibited objective. See N. L. R. B. v. Denver

Arnold's employees about joining the union noted, 245 F.2d 545, supra, were not included therein, but our scope of review of the District Court's opinion is governed by different standards and considerations from those in this proceeding to enforce an order of an administrative agency. Compare Federal Rule of Civil Procedure 52(a), 28 U.S.C.A. with Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Although our conclusions herein are largely the same as in our prior decision, in part because the records in the proceedings are so similar, our present decision is based solely on the record before us and with due regard for the expertise of the Labor Board.

5. The cases cited by the Board for applying the presumption are not in point. They both deal with a situation where employees who designated the union as their bargaining agent—in one case about a year prior to the election—would be presumed not to have changed their minds in the absence of any contrary evidence indicating a change. N. L. R. B. v. National Motor Bearing Co., 9 Cir., 1939, 105 F.2d 652; N. L. R. B. v. Piqua Munising Wood Prod. Co., 6 Cir., 1940, 109 F.2d 552. There was no intervening event, such as the certification of another union, which made the original objective both impractical and illegal.

Bldg. & Const. Trades Council, 1951, 341 U.S. 675, 688, 689, 71 S.Ct. 943, 95 L.Ed. 1284. We do not think the statutory phrase "an objective" was properly applied in this case.

Section 8(b) (4) (C) was not intended to deter or terminate all picketing but only that picketing which is decided upon in order to attain an illegitimate end. All other picketing is permissible. Cf. Garner v. Teamsters, etc., Union, 1954, 346 U.S. 485, 499–500, 74 S. Ct. 161, 98 L.Ed. 228; Douds v. Local 50, 224 F.2d at page 51. In the circumstances of this case, it cannot reasonably be found that Local 50 decided to continue the picketing, after certification of the rival union, in order to achieve the illegitimate end of immediate recognition for that goal was clearly out of reach. At most, that could only have been an extremely faint hope accompanying the lawful present objective of gaining membership. Picketing which is obviously for some permissible objective should not be condemned because, arguably, there may also be such a residual hope that a prohibited end will also be realized.

"An objective," for purposes of § 8(b) (4) (C) should therefore include only those aims the achievement of which can be considered a reason for the picketing. To also include all vague and speculative hopes simply because they may coexist with real and immediate "springs of action" would virtually prohibit all post-certification organizational picketing. Such a result is not in accord either with the letter or the spirit of the Act. See Douds v. Local 50, 224 F.2d at page 51.

## IV. Inducement of a Work Stoppage

Nor is there any support in the record for the Board's conclusion that the picketing constituted an inducement or encouragement of Arnold's employees "to engage in, a strike or a concerted refusal * * * to use * * * transport * * * or work on any goods." § 8(b) (4) (C) of the Act.

The Board purported to rely on our opinion in N. L. R. B. v. Business Machine & Office Appliance Mechanics, 2 Cir., 1956, 228 F.2d 553 for the proposition that it is not necessary to find a specific intent to induce a work stoppage where that is "the inevitable result or even the 'natural and probable consequence.'" 228 F.2d at page 560.

The Board stated that "the mere existence of a picket line is in most instances a 'strike signal,'" and that "it is the rare rather than the usual picket line which cannot be said to have this effect." It therefore seems to have concluded that it could dispense with any evidence to support an inference of "inevitable" or "natural and probable" inducement, and seemed to hold that absent rebuttal evidence, the mere fact of picketing is sufficient to raise a presumption of inducement, which supports a finding of intent to induce a work stoppage.

In the first place, we do not agree that the fact of picketing alone, absent supporting evidence of the surrounding circumstances, should raise any presumptions as to the intent or probable consequence of the picketing. In every case, the issue is whether the picketing is likely to induce a work stoppage in the particular context in which the picketing takes place and there must be some independent evidence supporting the inference of inducement, in addition to the fact of picketing. Any presumptions about consequences from the fact of picketing seem to us to be inconsistent with the approach taken in N. L. R. B. v. Business Machines, supra. See 228 F.2d at page 560.

Moreover, the context in which this picketing occurred, shows clearly that a work stoppage was not the "natural and probable consequence" of this picketing. Nothing said by the pickets, or by the placards after the November 15 certification, urged the Arnold employees or any others to go on strike. Moreover, no employee failed to cross the picket line

or ceased work.[6] As a matter of fact it was not shown that any of Arnold's more than 350 employees was a member of Local 50—indeed the overwhelming majority, 306 out of the 332 participating, had just voted for the rival union.

The evidence of post-certification activity does show that on several occasions the pickets asked Arnold employees to join Local 50. But this is not evidence of an illegal intent to induce a work stoppage, and post-certification picketing merely for the purpose of soliciting membership is not prohibited.

What we said in N. L. R. B. v. Business Machines, supra, applies equally to the facts here: * * * "It cannot be assumed that a picket line will prevent even unionized employees from crossing it when the union apparently intends that they shall cross and takes steps to make its intent plain. Such an assumption is even more doubtful when it appears * * * that the employees unanimously disregarded the pickets and went to work." 228 F.2d at page 560.

As we find no substantial evidence in the record to support the crucial findings and conclusions of the Board, enforcement is denied.

---

6. While the success or failure of the picket line is not determinative of its legality, N. L. R. B. v. Associated Musicians, 2 Cir., 1955, 226 F.2d 900, it is some evidence of the tendency of a picket line to cause a work stoppage, along with other circumstances.