John A. PENELLO, Regional Director of the Fifth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

UNITED HATTERS, CAP AND MILLINERY WORKERS UNION, AFL-CIO, Respondent.

No. 11140.

United States District Court
D. Maryland.

June 8, 1959.

Jerome D. Fenton, Thomas J. McDermott, Winthrop A. Johns, Sanfjord B. Teu, II, and Charles B. Slaughter, National Labor Relations Board, Washington, D. C., for petitioner.

Jacob J. Edelman and Bernard W. Rubenstein, Baltimore, Md., for respondent.

R. DORSEY WATKINS, District Judge.

This proceeding is before the court on a petition filed for and on behalf of the National Labor Relations Board (the Board), by John A. Penello, Regional Director of the Fifth Region of the Board, pursuant to the provisions of section 160(l) of Title 29 U.S.C.A. codifying section 10(l) of the Labor Management Relations Act,[1] 1947, as amended (29 U.S.C.A. § 141 et seq.). The petition, which seeks a temporary injunction pending the final disposition by the Board of the matters herein involved, was filed after preliminary investigation of charges made by Korber Hats, Inc. (Korber) of Fall River, Massachusetts, alleging that respondent has engaged in, and is engaging in, unfair labor practices within the meaning of section 158(b), subsection (4)(A) of Title 29 U.S.C.A., the Regional Director having found reasonable cause to believe such charges were true. This court has jurisdiction of the subject matter and of the parties.

The prerequisite to the granting of the relief contemplated by section 160(l) of Title 29 is a finding by the court that there is "reasonable cause to believe" that a violation of the Act, as charged, has been committed. The court is not called upon in this proceeding to

1. Also commonly referred to as the Taft-Hartley Act.

decide whether in fact the charges are true or whether in fact a violation of the Act has been committed in that the picketing hereinafter described constitutes the type of secondary activity proscribed by the Taft-Hartley Act. The responsibility for making the ultimate determination of the truth of the charges and the existence of a violation of the Act affecting commerce has been placed by Congress primarily on the Board, subject to review by the Court of Appeals of this Circuit (Penello v. Milk Drivers and Dairy Employees Local Union, D.C.Md. 1957, 156 F.Supp. 366, 368).

Not all types of secondary activity are so prohibited. Section 158 provides:

\* \* \* \* \* \*

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \* \*

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring \* \* \* any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; \* \* \*"

Under the facts in the instant case the Board contends that the plain purpose of the picketing engaged in by the respondent is to induce and encourage the employees of Theodore Epstein & Sons and the employees of other employers (such employers being the cotenants of Epstein and the motor carriers doing business with Epstein) to refuse to work and thereby force or require Epstein's suppliers or the employers who deliver or pick up goods, to cease doing business with Epstein, and to force or require Epstein to cease doing business with Korber. In short the Board alleges that respondent is exerting unlawful pressure against Epstein, a neutral secondary employer, and other neutral employers, in support of its dispute with Korber, the primary employer. Respondent on the other hand asserts that its picketing is within the area outlined by the courts as permissive customer picketing.

After a hearing on the petition at which testimony was taken the court finds the following facts to be basically undisputed. For some time past, respondent has been engaged in a labor dispute with Korber, a manufacturer of men's hats. In support of this labor dispute, respondent has since October 14, 1958, been picketing the premises of Korber in Fall River, Massachusetts. In further support of its dispute with Korber, respondent since December 5, 1958, has been picketing the premises in Baltimore, Maryland of Theodore Epstein & Sons (Epstein), a wholesale distributor of men's hats. Epstein receives its hats from approximately ten to fifteen major manufacturers, including Korber, in various states among these being New York, New Jersey, Massachusetts and Missouri. The hats are made up specifically to Epstein's order regarding dimensions, colors and sizes and are shipped to Epstein from the various manufacturers by common motor carrier. The hats are then assembled by Epstein, which does no manufacturing itself, and sold to retail outlets for resale, such outlets being men's stores selling hats only, men's specialty stores, general merchandise stores and small department stores throughout the Southeastern states of Maryland, Virginia, North and South Carolina and Georgia. There is no identification within the hats as to the manufacturer nor do they carry the name Epstein. Rather, all hats received from the ten to fifteen manufacturers mentioned above are distributed under one of three trade marks—belonging to Epstein— Holbert, Tepson or Headmaster, the last two appearing in hats manufactured for Epstein by Korber. During 1958 Epstein received from points outside of the state of Maryland merchandise, the value of which was in excess of $50,000, and

shipped goods valued in excess of $50,000 to points outside of Maryland. Its total number of customers approximates nine hundred of whom twenty-seven, or about three per cent, are located in Maryland while about half of the twenty-seven are located in Baltimore City, sales to its Baltimore customers comprising no more than four per cent of Epstein's total business operation. Hardly any of Epstein's customers come to Epstein's place of business, practically all of Epstein's sales being made at the retailer-buyer's place of business. Out of Epstein's total number of customers of 900, not more than 25 visited Epstein's during the previous year and during the two month period from the beginning of picketing by the respondent until the hearing on the present petition for a temporary injunction about ten customers had visited the picketed premises.

Epstein is a partnership owned and operated by Theodore Epstein and his two sons, Irvin E. and Gilbert Epstein. The partnership has but one employee, Willard H. Wagner, a non union worker who is a combination shipping clerk, stock clerk and errand boy. Epstein rents the third, fourth and fifth floors of the building picketed while two other business firms occupy the first floor, and a third firm the second floor. The building is approximately 22 feet wide with two entrances about 8 feet apart, the front or north entrance being used by the first floor employees and customers and the south entrance, giving access to a freight and passenger elevator operated by an employee of the landlord, being used by the second floor tenant and by Epstein's one employee, its associates and by truck drivers making deliveries to, or picking up shipments from, Epstein.

As previously stated, in the fall of 1958, United Hatters, Cap and Millinery Workers International Union became involved in a labor dispute with Korber of Fall River, Massachusetts. Pursuant to this dispute, a representative of the union, its business manager in the Baltimore area, approached Irvin E. Epstein in September of 1958 in order to advise of the existence of the labor dispute and to recommend Epstein's purchasing its straw hats from a manufacturer other than Korber. Mr. Epstein replied that it was too early in the season to be concerned with the ordering of straw hats and the conversation ended there.[2] Subsequently, in the early part of December, the union representative again contacted Mr. Epstein stating that he understood a shipment of 44 cartons of hats was being made from Korber to Epstein and asking if Epstein intended to refuse to take delivery; if not, then that Epstein's would be picketed. On December 5, the day after the first Korber shipment of the season arrived and was accepted, two pickets appeared wearing signs bearing the legend "T. Epstein and Sons sells non union hats made by Korber Hat Company. Do not buy Korber Hats." Included on each sign was the union's name. The pickets walked back and forth from the north to the south entrance and, when the weather was inclement, stood in the doorway of the south entrance. During this picketing shipments were received from Korber as well as from many other manufacturers and suppliers and all normal deliveries by Epstein to carriers for shipment to its customers were made without physical interference by the union or by a union picket, with the exception of one minor incident.[3] There was, in fact, no work stoppage at Epstein, no refusal by any employees of any person doing business with Epstein to cross the picket line, nor any failure of supplies or deliveries to Epstein and there were no

2. A similar conversation had taken place between the same two parties in 1957 but at the time that the 1957 call was made Epstein had already purchased 95% of its straw hats. No picketing of Epstein by respondent ensued in 1957.

3. The single event, as described by Epstein's employee, apparently started inadvertently and unintentionally and ended almost immediately in a feeble attempt at humor by the union picket:

"A. * * * this picket stepped in front of me and just looked at me, and I said excuse me, and he said I don't move out of the way for anybody. They move out of the way for me. I bumped

express appeals for concerted action, orders, directions, instructions or requests made to any employee of Epstein or to any employee of any other neutral employer. The Board's contention is that the requisite improper attempted inducement or encouragement of employees can reasonably be inferred from the above facts.

■ The Taft-Hartley Act "does not completely shelter neutrals—in this case, so-called 'secondary' employers" (National Labor Relations Board v. Service Trade Chauffeurs, Salesmen & Helpers, Local 145, 2 Cir., 1951, 191 F.2d 65, 67). Requests, even threats, when addressed directly to secondary employers are not unlawful (Schatte v. International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of United States and Canada, 9 Cir., 1950, 182 F.2d 158, 165, certiorari denied 1950, 340 U.S. 827, 71 S.Ct. 64, 95 L.Ed. 608, rehearing denied 1950, 340 U.S. 885, 71 S.Ct. 194, 95 L.Ed. 643; Rabouin v. National Labor Relations Board, 2 Cir., 1952, 195 F.2d 906, 911). Likewise the inducement or encouragement of concerted conduct on the part of neutral employers' customers is not prohibited by section 158(b) (4) (A). (National Labor Relations Board v. Service Trade Chauffeurs, Salesmen & Helpers, Local 145, supra, 191 F.2d 65, 68).

" * * * The section does not speak generally of secondary boycotts. It describes and condemns specific union conduct directed to specific objectives. It forbids a union to induce employees to strike against or to refuse to handle goods for their employer when an object is to force him or another person to cease doing business with some third party. Employees must be induced; they must be induced to engage in a strike or concerted refusal; an ob-

ject must be to force or require their employer or another person to cease doing business with a third person. Thus, much that might argumentatively be found to fall within the · broad and somewhat vague concept of secondary boycott is not in terms prohibited. A boycott voluntarily. engaged in by a secondary employer for his own business reasons, perhaps because the unionization of other employers will protect his competitive position or because he identifies his own interests with those of his employees and their union, is not. covered by the statute. Likewise, a. union is free to approach an employer to persuade him to engage in a boycott, so long as it refrains from the specifically prohibited means of coercion through inducement of employees." (Local 1976, United Brotherhood of Carpenters and Joiners of America, A.F.L., v. National Labor Relations Board, 1958, 357 U.S. 93, 98–99, 78 S.Ct. 1011, 1015, 2 L.Ed.2d 1186).

■ The Board contends that the objects of respondent's acts and conduct. were and are to force or require other employers and persons to cease doing business with Epstein and to force or require Epstein to cease doing business with Korber, illegal objectives if coupled with the use of the proscribed method of achieving such a cessation of existing business relationships. The court finds. reasonable cause to believe that an object, and indeed the sole object, of the picketing of Epstein by the respondent was to cause Epstein to cease doing business. with Korber. Such an objective is evidenced by, and in fact was expressly announced during the course of, the two phone calls in September and December of 1958.[4]

into him, and moved him on the side, and I went right on through.

\* \* \* \* \*

"A. I went back for a second. box, and on the way back, he hit me back and said I got you back and was sort of laughing foolishly at me.

"Q. Did you have any other incident of that nature?
"A. No, sir." (Transcript, p. 37).

4. Transcript of testimony of Irvin Epstein, pp. 15–16.
"In late September, he [the business manager of the union] told me that they

" * * * Though the Union was within its rights in appealing directly to neutral employers not to accept deliveries from the primary employer, when picketing followed noncompliance with the Union's appeal the combination of circumstances could be considered by the Board in determining that an object of the picketing came within the object condemned by the secondary boycott section of the statute." (Truck Drivers and Helpers Local Union 728 of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America AFL-CIO v. National Labor Relations Board, 1957, 101 U.S. App.D.C. 420, 249 F.2d 512, 514, certiorari denied 1958, 355 U.S. 958, 78 S.Ct. 543, 2 L.Ed.2d 533).

■ Further, respondent in its memorandum in opposition to the granting of an injunction admits such was the objective of the picketing by its statement that there "can be no confusion that the dispute is with Korber Hats and that Epstein and its customers are being urged not to buy Korber Hats." [5] While the language on the picket signs is limited to, and stated as, an appeal to buyers, it could not be an appeal to the consuming public as the hats in question are not identifiable by the public either as manufactured by Korber or as distributed by Epstein nor does the consuming public buy directly from Epstein, thus occasioning entering and leaving Epstein's premises to make purchases. To this court, moreover, it appears extremely doubtful that the picketing was basically an attempt to reach customers of Epstein, that is, the retailers—first, because there is no evidence that they, as the consuming public, would have any way of knowing whether or not they were buying Korber

manufactured hats short of an inquiry directed to Epstein; secondly, because the timing of the picketing coincided with the beginning of Korber's seasonal deliveries to Epstein and not with the time of sale or shipment of Korber hats to Epstein's customers; and, most significantly, because the proportionate number of Epstein's customers who could be reached by this type of picketing is virtually negligible. To the extent that any solicitation of Epstein's customers was intended or effected, the court considers this merely an additional means of accomplishing the plain purpose of the respondent's picketing, that is, to cause Epstein to cease doing business with Korber. However, as previously stated, this purpose is not one within the interdiction of the Taft-Hartley Act if the means used to accomplish it, or to attempt to accomplish it, are lawful means.

The question for determination thus becomes—is there reasonable cause to believe that to achieve its desired result the respondent union attempted to induce employees of neutral or secondary employers to strike or to engage in concerted refusal to handle any goods, articles, materials or commodities or to perform any services. The picketing took place at entrances used by, in addition to all other persons entering or leaving the building, the employee of Epstein, by the elevator operator employee of the landlord, by the employees of Dutchess Linen Manufacturing Co., and Linen Arts Novelty Co., and Check Cashing Company, cotenants of Epstein, and by the employees of motor carriers and truck drivers making deliveries to or pickups from Epstein. From this, the Board argues that the appeal of the pickets was and is directed to such employees.

■ While the failure of a picket line is not determinative of its legality, it

were having trouble up there and if we did not get any straw hats that we would know why, and we should buy from somebody else.

 *  *  *  *  *

"He called me the early part of December, 1958, and he told me there was a

shipment coming in to me of 44 pieces or 44 cartons of straw hats from Korber, and I said is that so. He said are you going to refuse them. I said no, I am not. He said they were going to picket in front of my place."

5. Respondent's memorandum, p. 7.

does have some probative value, little or great depending upon all the surrounding circumstances, as to the intent of the picketing union (Douds v. Local 50, Bakery and Confectionery Workers International Union, A.F.L., 2 Cir., 1955, 224 F.2d 49, 51; National Labor Relations Board v. Local 50, Bakery and Confectionery Workers International Union, AFL-CIO, 2 Cir., 1957, 245 F.2d 542, 546—connected case; National Labor Relations Board v. Business Machine and Office Appliance Mechanics Conference Board, Local 459, International Union of Electrical, Radio & Machine Workers, CIO, 2 Cir., 1955, 228 F.2d 553, 560, certiorari denied 1956, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483). In the instant case coupled with the fact of no work stoppage and of no refusal on the part of any employee to cross the picket line is the absence of any interference by, or attempt by, the respondent union to approach any employee of any neutral employer either by way of appeals, orders, directions, instructions or requests. The signs carried by the pickets were clearly limited in their appeal to buyers and, although as the court has previously stated it doubts that the picketing was basically an attempt to reach Epstein's customers or the ultimate consumer, this is not the equivalent of saying that it was an attempt to induce or encourage employees to strike or to engage in concerted action. As was said in Douds v. Local 50, Bakery and Confectionery Workers International Union, A.F.L., supra, 224 F.2d 49, 51, where the court was considering the objective of the picketing:

*  *  *  *  *  *

"Ostensibly the signs which the two pickets carried were intended to dissuade customers from buying Arnold's bread. The district court expressed skepticism, which we share, as to whether this was their real purpose, since no customers ever come to Arnold's premises to buy bread and the shipping platform is on a back street little traveled by the public. His opinion stated [127 F. Supp. [534] 536] that '[T]he ultimate objective of the picketing is to bring about a situation where Local 50 will be recognized as the bargaining representative of the employees' of Arnold. However, we do not understand this to be a finding that 'an object' of the picketing was  *  * [an] object forbidden by clause (C). In so far as the picketing was intended to influence Arnold's employees it was merely propaganda for the AFL union, which might result in diminishing membership in the certified union so that Local 50 would get a majority when another election should be held. We do not understand this to be a prohibited objective. With respect to the employer the only effect of the picketing was, as Judge Dawson said, to cause 'some justifiable irritation' and 'such conduct, even though irritating, is not illegal.'"

(Accord: National Labor Relations Board v. Local 50, Bakery and Confectionery Workers International Union, AFL-CIO, supra, 245 F.2d 542, 546—connected case).

In the instant case the picketing was an obvious attempt to annoy and embarrass Epstein. This is not a prohibited means of coercion. The successfulness, as well as the real purpose and aim, of the picketing is evidenced by the testimony of two of the partners. Surely they better than anyone else are in a position to evaluate the situation in which they find themselves. That they feared no inducement of any employees to strike or engage in concerted work refusal and that they were highly annoyed by the union's conduct is clear.[6]

6. "He [union representative] said they were going to picket in front of my place. I said that they would look funny picketing outside my 4th floor window, and he said are you going to refuse that shipment, and I said no, and with that he hung the phone up on me." (Transcript pp. 15–16; Irvin Epstein).

"Q. And as a matter of fact, you know of no instance where there was any interference on the part of a picket with any delivery made to your establishment

On the issue of whether or not picketing is directed toward the inducement of employees to concerted refusal the union or non union status of those involved is not without significance. Epstein's one employee testified he was non union and Mr. Irvin Epstein stated on the stand that he assumed that the elevator operator, the sole employee of the landlord, was likewise not a union member. The record is silent as to the employees of the other tenants. Of even greater significance is whether or not the inducement is to "concerted" activity. In National Labor Relations Board v. International Rice Milling Co., Inc., 1951, 341 U.S. 665, 670–671, 71 S.Ct. 961, 964, 95 L.Ed. 1277, during the course of picketing, union agents seeing a truck of a neutral employer approaching formed a line across the road, stopped the truck, advised its occupants that there was a strike on and told them that the truck would have to turn back. When the truck proceeded to the picketed mill by a short detour, stones were thrown at it. The Supreme Court said of this type of conduct:

\* \* \* \* \* \*

"A sufficient answer to this claimed violation of the section is that the union's picketing and its encouragement of the men on the truck did not amount to such an inducement or encouragement to 'concerted' activity as the section proscribes. While each case must be considered in the light of its surrounding circumstances, yet the applicable proscriptions of § 8(b)(4) are expressly limited to the inducement or encouragement of *concerted* conduct by the employees of the neutral employer. That language contemplates inducement or encouragement to some concert of action greater than is evidenced by the pickets' request to a driver of a single truck to discontinue a pending trip to a picketed mill. There was no attempt by the union to induce any action by the employees of the neutral customer which would be more widespread than that already described. There were no inducements or encouragements applied elsewhere than on the picket line. The limitation of the complaint to an incident in the geo-

or any shipment made by your establishment? A. No, I do not.

"Q. Your company, or you on behalf of your company, had no occasion to bring any complaint against the union to any governmental agency, did you? A. I don't know. *I feel that I had a complaint.* (Emphasis supplied).

"Q. Well, I ask you specifically, did you on behalf of your company or did anyone on behalf of your company, to your knowledge, complain to any governmental agency, State or Federal regarding the picket that was posted in front of your establishment? A. If you mean the police, not to the police or governments.

"Q. Any agency? Did you bring any complaint to the Labor Relations Board? A. I think some complaint was brought." (Transcript pp. 26–27; Irvin Epstein).

"Q. Did you visit the Regional Office of the National Labor Relations Board in Baltimore? A. Yes, sir.

"Q. And when was that? A. That was the day that the picket appeared, and that was approximately December 5th.

"Q. Tell us what was the nature of your visit? A. Well, actually, Your Honor, *I did not think it fair* that a picket appeared in front of my building. Therefore, I sought some help from the local agency, so that I could determine how I could move the picket or have the . picket removed. (Emphasis supplied).

"Q. Did you file a formal charge at that time? A. Yes, I did." (Transcript pp. 39–40; Gilbert Epstein).

"Mr. Slaughter: [counsel for National Labor Relations Board] If Your Honor please, I would propose to counsel for the Union that when the witness and his brother spoke of a charge they referred to this affidavit, which was taken *subsequent to the filing of the charge by the Korber Hat Company.*" (Emphasis supplied.) (Transcript p. 42; counsel for National Labor Relations Board).

"The Court: Well, Mr. Epstein, is it still your recollection that you did consult with the board?

"The Witness: Yes, I did.

"The Court: You did not file a formal paper at that time?

"The Witness: No sir." (Transcript p. 43 Gilbert Epstein).

graphically restricted area near the mill is significant, although not necessarily conclusive. * * * A union's inducements or encouragements *reaching individual employees of neutral employers only as they happen to approach the picketed place of business generally are not aimed at concerted, as distinguished from individual, conduct by such employees.* Generally, therefore, such actions do not come within the proscription of § 8(b)(4), and they do not here." (Emphasis supplied.)

See also: Joliet Contractors Association v. National Labor Relations Board, 7 Cir., 1953, 202 F.2d 606, 609, 612, certiorari denied 1953, 346 U.S. 824, 74 S.Ct. 40, 98 L.Ed. 349; Cf. factually—Amalgamated Meat Cutters and Butcher Workmen of North America, AFL, Local 88 v. National Labor Relations Board, 1956, 99 U.S.App.D.C. 24, 237 F.2d 20, 23–24, certiorari denied 1957, 352 U.S. 1015, 77 S.Ct. 562, 1 L.Ed.2d 545, where the appeals—although made to individual employees of various employers—were directed to the employees as members of a group and encouraged concerted "parallel action".

It appears to the court that if the respondent union had intended any inducement of any employees not to cross the picket line, those most likely to be susceptible to such solicitation would be the employees and truck drivers of the motor carriers making deliveries to, or pickups from, Epstein. The record shows that Epstein uses many different motor freight and express and transfer companies; that there is no continuing business relationship between Epstein and any of these companies; and that individual trucks are ordered from individual companies on an individual, trip to trip basis. It is not without import that Mr. Irvin Epstein in his testimony himself chose to use the word "individual."

"Q. Who are the people who operate these common carriers? Are they owners of vehicles: Are they employers? What are they?

"A. They work for the various truck companies.

"Q. What are these?

"A. Maclean, Bayline,—

"The Court: What was the last one?

"The Witness: Bayline, Wooleyhan, Associated—there are so many that we use, sir.

"The Court: How do you arrange for that? Is there any central trucking distribution system?

"The Witness: No, sir. We call every individual truck company and everyone sends their own individual truck." (Transcript pp. 11–12).

The court is unable to find on the basis of this testimony the prerequisite for injunctive relief, i. e. reasonable cause to believe that the union activity involved constitutes attempted inducement or encouragement of *concerted* conduct by the employees of said motor carriers. Rather this type of union conduct even if it had resulted in a refusal by an individual truck driver to cross the picket line, as it did not, would fall within the compass of individual solicitation as defined in the International Rice Milling Company case.

As to the other employees who crossed the picket line of the respondent union, National Labor Relations Board v. Business Machine and Office Appliance Mechanics Conference Board, Local 459, International Union of Electrical, Radio & Machine Workers, CIO, supra, 228 F. 2d 553 is factually quite similar to the instant case. There the court said:

"* * * It is true that picket lines are often effective to prevent union members from crossing them. But here there was no evidence that any of the employees of Royal's customers, working at the 37 picketed office buildings, were unionized either by Local 459 or by any other union. Indeed it is likely that most or all of them were not as it is common knowledge that office workers are relatively unorganized. See also

Monthly Labor Review, Vol. 78, No. 1, page 64 (U. S. Department of Labor, Bureau of Labor Statistics, January 1955). It cannot be assumed that a picket line will prevent even unionized employees from crossing it when the union apparently intends that they shall cross and takes steps to make its intent plain. Such an assumption is even more doubtful when it appears, as it did here, that the employees unanimously disregarded the pickets and went to work. Cf. Douds v. Local 50, Bakery and Confectionery Workers International Union (Arnold Bakers), 2 Cir., 1955, 224 F.2d 49. Even the testimony of representatives of the picketed firms indicates that they had no fear that their employees would take any action to coerce them regarding their business with Royal. Their only fear seemed to be possible public embarrassment. Such embarrassment and persuasion the union is privileged to pursue. If on this evidence we were to grant the Board's petition with respect to the customer picketing, we would, as a practical matter, come very close to condemning all customer picketing. Clearly this is not the purpose of the Act." (228 F.2d 553, 560–561).

The Board has treated and briefed the issue of customer picketing in this proceeding on the basis that as the picketing can not reasonably be said to be an appeal to Epstein's customers (the retailers) or to the consuming public, the existence of permissive customer picketing has been negated and, thus, it of necessity follows that the union's appeal is to employees. The fallacy in this reasoning is that the customers being picketed are not Epstein's customers but are Korber's customers. Indeed, Epstein is not the only Korber customer who has been the object of the respondent union's attention. The union's brief alleges, and it has not been denied by the Board, that in the course of the dispute between the union and Korber, the union's representatives in different localities have approached other wholesalers handling Korber hats in order to advise them of the existence of the labor dispute. On the same day that it instituted proceedings before the Board in this case, Korber filed a charge in Region Two (New York) of the National Labor Relations Board, against the respondent union under section 158(b)(4) of Title 29 U.S.C.A. alleging, as in the instant case, a secondary boycott by the union against Messing & Allison, Inc., a wholesaler of men's hats in New York (Case No. 2-CC-492). The Regional Director of the Second Region refused to issue a complaint and dismissed the charge. It is not without relevance that, as in this proceeding, the charge was filed not by the firm allegedly being subjected to illegal coercion but rather was filed by Korber, an indication of lack of apprehension on the part of the neutral employer of inducement of employees to concerted work refusal; that again the customer approached was not the retailer nor the ultimate consumer but the wholesaler—Korber's customer; and that the union's conduct or activity in that instance at least apparently did not give rise to reasonable cause for belief that it was of the type proscribed by the Act.

Likewise in the present case on the basis of all of the foregoing facts this court does not find reasonable cause to believe that the picketing carried on by the respondent union constitutes an attempt to induce employees of neutral or secondary employers to strike or to engage in concerted refusal to handle any goods, articles, materials or commodities or to perform any services. As against all of the factors previously recited by this court as negating such an intent or attempt by the union, the Board to establish the existence of proscribed activity relies upon one fact, that the picketing occurred at the site of a secondary employer's place of business, where the primary employer's workers were not present and thus it is argued that this secondary activity, per se, constitutes a violation of the Act. The situs of the picketing alone is not sufficient evidence of il-

legal coercion (Alpert for And on Behalf of N.L.R.B. v. Local 660, International Brotherhood of Electrical Workers, AFL-CIO, D.C.Conn.1959, 169 F.Supp. 384, 387). The Board having failed to show that grounds exist for reasonable cause to believe that the union's conduct is proscribed by the Act, the petition for a temporary injunction is hereby denied; without prejudice to the renewal of the petition should in the future the union's type of activity change, thereby justifying such a renewal.