Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner-Appellee,

v.

CHEFS, COOKS, PASTRY COOKS AND ASSISTANTS, LOCAL 89, HOTEL AND RESTAURANT EMPLOYEES AND BARTENDERS INTERNATIONAL UNION, AFL-CIO,

and

Dining Room Employees Union, Local 1, Hotel and Restaurant Employees and Bartenders International Union, AFL-CIO, Respondents-Appellants.

No. 336, Docket 26120.

United States Court of Appeals Second Circuit.

Argued March 30, 1960.

Decided July 6, 1960.

Winthrop A. Johns, Asst. Gen. Counsel, N.L.R.B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and

Jerome L. Avedon, Atty., N.L.R.B., Washington, D. C., on the brief), for petitioner-appellee.

Jerome B. Lurie, New York City (Boudin, Cohn & Glickstein, New York City, on the brief), for Chefs, Cooks, Pastry Cooks & Assistants Union, Local 89, respondent-appellant.

Benjamin D. Stein, New York City (Pinto & Stein, New York City, on the brief), for Dining Room Employees Union, Local 1, respondent-appellant.

Before WATERMAN and BARNES,* Circuit Judges, and SMITH, District Judge.

SMITH, District Judge.

This is an appeal from an order of the District Court for the Southern District of New York granting a temporary injunction against the appellants, the hereinafter mentioned unions, enjoining them from carrying on certain picketing at the Stork Club in New York City. The injunction was sought by the Regional Director of the National Labor Relations Board pursuant to Section 10(*l*) of the National Labor Relations Act, as amended, 29 U.S.C.A. 160(*l*), to restrain the appellants, Chefs, Cooks, Pastry Cooks and Assistants, Local 89, Hotel and Restaurant Employees, AFL–CIO and Waiters and Waitresses, Dining Room Employees, Local 1, Hotel and Restaurant Employees Union, AFL–CIO from picketing the Stork Club pending final disposition of a Section 8(b)(7)(C) unfair labor practice charge which has been lodged against the appellants.

The picketing began over three years ago in January, 1957 when a majority of the Stork Club employees went on strike and commenced picketing the premises in protest to an alleged discharge of certain employees for engaging in union activity. The picketing, at that time and up until January 13, 1960, admittedly had as one of its objectives, to compel the employer to recognize and bargain with the unions. The employer attempted to enjoin the picketing in the New York state courts but was unsuccessful. After the picketing began, the unions filed charges with the New York State Labor Relations Board, alleging that the Stork Club had engaged in unfair labor practices under the New York State Labor Relations Act, Labor Law, McKinney's Consol.Laws, c. 31, § 700 et seq. The proceedings with the New York Board extended to January, 1959, when the Board dismissed the charges on the ground that it lacked jurisdiction. The unions were precluded from bringing the charges before the National Labor Relations Board in October of 1958 when it was finally decided that the National Labor Relations Board had jurisdiction since the six month statute of limitations had run. The picketing has continued since January of 1957 and the appellants have never been certified as the collective bargaining representatives of the employees at the Stork Club. On November 13, 1959, the Labor-Management Reporting and Disclosure Act of 1959, Public Law 86–257, 73 Stat. 519, 544, became effective and made certain amendments to the National Labor Relations Act, 29 U.S.C.A. § 141 et seq., one of which was the addition of Section 8(b)(7).[1]

---

* Of the Ninth Circuit, sitting by designation.

1. Section 8(b)(7) provides as follows:
"(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:
"(A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under section 9(c) of this Act,
"(B) where within the preceding twelve months a valid election under section 9(c) of this Act has been conducted, or

On January 6, 1960, the Stork Club filed a complaint with the National Labor Relations Board charging that the appellants were engaging in unfair labor practices under Section 8(b)(7)(C) of the Act. After receiving notification of the filing of the charge, the officials of the unions met with their attorneys on January 13, 1960 and were advised that under the Act they were no longer permitted to picket in order to gain recognition as the bargaining representatives of the employees. As a result of this meeting, letters were sent to the National Labor Relations Board and to the Stork Club advising that the unions had withdrawn their demands for recognition but would continue picketing for the lawful purpose of advising the public.[2] Signs carried by the pickets were also changed on January 14, 1960 to carry the following inscriptions: [3]

"To the Public
The Stork Club
Discharged Employees
Because They Joined
Chefs, Cooks, Pastry Cooks
& Asst's Union
Local 89 AFL–CIO"

"(C) where such picketing has been conducted without a petition under section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Provided*, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 9(c) (1) or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided further*, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

"Nothing in this paragraph (7) shall be construed to permit any act which

"Stork Club
Employees
do not
Enjoy
Union Wages,
Hours &
Working Conditions"

"To the Public
The Stork Club
does not have a
Contract With
Chefs, Cooks,
Pastry Cooks
& Asst's Union
Local 89 AFL–CIO"

The picketing by the unions continued thereafter up until the granting of the injunction below on which this appeal is based. The picketing was carried on in proximity to the main entrance to the Stork Club which is the sole entrance used by customers and deliverymen alike. The restaurant is open for customers from 11:00 a. m. to 4:00 a. m. the following morning from Monday through Friday and on Saturday and Sunday, from 5:00 p. m. to 4:00 a. m. the following morning. The picketing has been

would otherwise be an unfair labor practice under this section 8(b)."

2. The letters stated:
"\* \* \* decided to cease picketing the Stork Restaurant, Inc. for the purpose of obtaining recognition and to withdraw their demand therefor.

"They decided to continue picketing the Stork Restaurant, Inc. for the following lawful purpose:

"1. To advise the public (including consumers) that Stork Restaurant, Inc. does not employ members of, or have a contract with, the two Unions.

"2. To advise the public (including the consumers) that the Stork Restaurant, Inc. discriminatorily discharged certain employees for their membership in the Unions and interfered with the right of its employees freely to select collective bargaining representatives.

"3. To advise the public (including the consumers) that the standard union wages, hours and working conditions do not prevail in the Stork Restaurant, Inc."

3. The legends on the picket signs carried until the change on January 14, 1960 are not shown in the record.

carried on by varying numbers of pickets ranging from one to five at a time and was conducted 24 hours a day with occasional breaks for 15 or 20 minutes. There has never been any violence.

There was testimony by three truck drivers, all members of the teamsters union and employed by employers other than the Stork Club, that they were assigned deliveries to the Stork Club on or after January 14, 1960, the date on which the unions made known their change in objective. The deliveries, one of five cases of beer and two each of a case of brandy, were not made according to these witnesses. The testimony was that they saw the pickets, spoke to no one, and decided not to make the deliveries. One witness testified that he did not read the signs while the other two testified that they merely saw the pickets and kept on going. The unions did not file a petition under Section 9(c) of the Act within thirty days from the commencement of the picketing.

In the proceedings below, Judge Dawson found that there was reasonable cause to believe that the respondent unions had as one of their objectives, that of forcing the employer to recognize and bargain with the unions. Major reliance was placed on the fact that the unions carried signs stating that the employer did not have a contract with the unions. It was also found that an effect of the picketing was to induce individuals employed by other persons in the course of their employment not to deliver goods or perform services at the Stork Club.

Upon review of the issuance of a temporary injunction under Section 10(l) of the Act, this court must determine whether the finding in the District Court that there was reasonable cause to believe the Act was violated was clearly erroneous under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. Douds v. Milk Drivers and Dairy Employees Union, 2 Cir., 1957, 248 F.2d 534, 537; Schauffler v. Highway Truck Drivers & Helpers, 3 Cir., 1956, 230 F.2d 7, 9. The District Court found, both, that the activity on the part of the unions consti-

tuted recognitional picketing proscribed by the Act, and also that the informational basis for the picketing was illegal because of its effect in inducing employees of another person not to make deliveries. The Act provides that picketing with an object to force or require an employer to recognize or bargain with a labor organization is an unfair labor practice where a Section 9(c) petition has not been filed within a reasonable time not to exceed 30 days from the commencement of the picketing. However, the further proviso is added that nothing in this paragraph shall be construed to prohibit picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, *inter alia,* not to deliver goods. The reasoning employed by the court below was that since the unions carried signs stating that they did not have a contract with the unions, this indicated that the unions wanted to obtain such a contract and thus wanted to force the employer to recognize and bargain with the unions. It was said that although the immediate objective may have been to divert business from the Stork Club, the ultimate objective was to force the employer to recognize the unions as the bargaining agents for the employees. The difficulty with this approach is that the statute specifically permits informational picketing for the purpose of advising the public, including consumers, that the employer does not have a contract with a labor organization. Of course, if this activity has the effect of inducing other employees not to make deliveries, then the picketing is made unlawful. The District Court enjoined all picketing, presumably on the ground that it constituted recognitional picketing and therefore should be curtailed in its entirety. We think that the injunction should have been tailored to reach only the illegal activity. To say that the carrying of

signs stating that the employer has no contract with the union is proof of recognitional picketing is to ignore the letter and, we think, the spirit of the statute. This is so because even if there had been a complete absence of any refusals to deliver induced by the picketing, the same reasoning as used by the court below could be applied to render the picketing unlawful. We think, therefore, that the statute requires a determination whether the picketing had as an objective, one of forcing or requiring the employer to bargain with or recognize the union. In considering this question, the fact that the union carried signs expressly allowed by the statute should not be a basis for concluding that the union had a recognitional objective. If, however, the allowable informational picketing had the effect of inducing other employees not to make deliveries, then, the picketing is to be declared unlawful but only to the extent that this mode of disseminating information is proven to have an unlawful effect.

In applying these principles, we think that the finding of the court that there was reasonable cause to believe that the picketing had as an objective, that of compelling the employer to bargain or recognize the union was clearly erroneous. The unions clearly announced the change in objective on January 14, 1960 and took action to modify their activity so as to bring it within the sphere of allowable informational picketing permitted by the Act. Their prior objective should not conclude the unions from engaging in lawful activity at a later time. In the Arnold Bakers case we rejected the application of a presumption of the continuity of a state of affairs in construing the legality of picketing where there is no independent evidence to support such a presumption. N.L.R.B. v. Local 50, Bakery and Confectionery Workers, 2 Cir., 1957, 245 F.2d 542, 547. There was testimony by the president of one of the unions in the instant case that the unions had the objective of informing the public of the conditions of employment so as to establish wages and conditions which prevail in the industry and that the signs would be withdrawn if that object were attained even if no contract resulted. There is no substantial independent evidence to warrant the conclusion that an object of the picketing was for recognition and to force or require the employer to bargain with the unions as the agents of the employees.

There was support for the finding that there was reasonable cause to believe that an effect of the picketing was to induce other employees not to make deliveries. The testimony of the deliverymen was that upon seeing the pickets, they decided not to make the deliveries.[4] It must be concluded that there is reasonable cause to believe that the failure to make these deliveries was induced through the picketing. However, to enjoin all picketing, even at times when deliveries would not be made but where there is ample opportunity to convey information to consumers and other members of the public, would seem to carry the scope of the injunction beyond what is contemplated by the Act. Although the House and Senate versions of the bill did not provide for the allowance of informational picketing, the final version of the bill as formulated by the conferees did insert such a provision.[5] In commenting on the change made by the conferees, Senator Kennedy stated:[6]

4. In the debate in the House, Representative Roosevelt noted the danger of prohibiting informational picketing by this standard through attempts by employers to set up fictitious unsuccessful deliveries. 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, pp. 1728–1729, U. S. Government Printing Office, 1959. However, there is no proof that this occurred in the present case.

5. This provision was insisted upon by the conferees to safeguard the rights of workingmen. 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, p. 1720, U. S. Government Printing Office, 1959.

6. Representative Udall, a member of the House Education and Labor Committee, stated: "The conference report also protects informational picketing that does

"Purely informational picketing cannot be curtailed under the conference report, although even this privilege would have been denied by the Landrum-Griffin measure."

In view of the protection which Congress obviously wished to provide for informational picketing by workingmen, we believe that the injunction in the present case, although properly issued, should have been framed so as to curtail only that which ran afoul of the Act. In arriving at this conclusion it is especially significant to note that the nature of the employer's business in this case is such as to afford the opportunity for informational picketing at times when the restaurant is open for business but when deliveries would not be expected. To curtail the dissemination of information by the unions in a manner approved by Section 8(b)(7)(C) at times when only consumers and other members of the general public would be expected to be exposed to this activity, is, we think, beyond what was intended to be prohibited by the Act, and unnecessarily raises a constitutional question by its impact on the right of free speech. See United States v. Hutcheson, 312 U.S. 219, 243, 61 S.Ct. 463, 85 L.Ed. 788 (concurring opinion of Justice Stone).

The case is remanded for a determination of the hours during which legal informational picketing can be carried on and for modification of the injunction in accordance with those findings.

WATERMAN, Circuit Judge (concurring).

My difficulty with the present case derives from the unusual provisions of the second proviso of Section 704(c) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C.A. § 158(b)(7)(C). The second proviso permits a union to picket without recourse to the provisions of Section 9(c) of the Amended Labor Relations Act, 29 U.S.C.A. § 159(c) where the purpose of such picketing is that of " * * * truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization * * * " However, this permission is subject to the caveat contained in the clause that immediately follows: " * * * unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services."

It is possible to read this "unless" clause as automatically converting permissible informational picketing into an unfair labor practice if any worker, employed by another person, should ever refuse to serve the picketed premises. When the statute is thus interpreted the objective of the picketing union becomes irrelevant. The interpretation emphasizes the word "effect," and, as I read their opinion, is the interpretation which my colleagues accept.

However, by emphasizing the word "induce" instead of the word "effect" it is possible to reach a different interpretation, for then it is arguable that Congress intended something more than a simple cause-and-effect relationship, and intended that the effect be one purposed by the picketing union. In support of this second suggested interpretation one should note that it has been held heretofore that only if the picketing is for an *unlawful objective* will peaceful picketing be an unfair labor practice. International Brotherhood of Electrical Workers v. N.L.R.B., 1951, 341 U.S. 694, 699–706, 71 S.Ct. 954, 95 L.Ed. 1299; N.L.R.B. v. Local 50, Bakery & Confectionery Workers, 2 Cir., 1957, 245 F.2d 542, 548. Absent an unlawful objective, a statutory restraint of peaceful picketing could raise constitutional questions. See Thornhill v. State of Alabama, 1940, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093.

not result in economic coercion—a right of free speech which would have been denied by the Landrum-Griffin Bill." 2 Legislative History of the Labor-Man-

agement Reporting and Disclosure Act of 1959, p. 1722, U. S. Government Printing Office, 1959.

But even if the first interpretation is to be accepted, there could well be implied exceptions to the sweep of this statute. For example, I think it clear that, in the present posture of this case, we are required to assume that the picketing began as a result of the employer's initial unfair labor practice; and it is also evident that this picketing began prior to the passage of the 1959 Act my colleagues are construing.

Nevertheless, I do not believe that at this time we should resolve the ambiguities of Section 8(b)(7)(C). The Petitioner only seeks temporary relief. Though the Board's regional director may have construed the section, the Board has not, and I believe it should be given an opportunity to do so. Cf. Douds v. Milk Drivers and Dairy Employees Union Local 584, 2 Cir., 1957, 248 F.2d 534, 538; Retail, Wholesale & Dept. Store Union v. Rains, 5 Cir., 1959, 266 F.2d 503, 505–506.

Therefore I concur in the result reached by my colleagues.